Here ye, here ye, Mr. Honorable Appellate Court of the 2nd Judicial District. It is now back in session. The Honorable Liam C. Brennan presiding. Please be seated. Your Honor, the third case on the docket this morning is 2-22-0042, Sandra Meinhart, Plaintiff Appellate v. Hy-Vee, Inc. and I am a corporation doing business as Hy-Vee Pharmacy with J.P. and J.C.R. Lee Humanoid Auxiliary and Solco Healthcare U.S. LLC Defendants, I.V.E., J.P. and J.C.R. Solco Healthcare Defendants Appellees. Argument for the Appellant, Mr. C. Nicholas Kronauer. Argument for the Appellee, Hy-Vee Corporation, Mr. Christopher J. Drinkwine. Argument for the Appellee, Solco Healthcare, Ms. Kimberly A. Jansen. Mr. Kronauer, if you are ready, you may proceed. Your Honor. Good morning. Good morning. May it please the Court, Counsel. As you are aware, my name is Nicholas Kronauer and I represent the Plaintiff. Today, the arguments I intend to go over are going to be the strict product liability claim, the voluntary undertaking theory, the res judicata, and preemption. Can you speak up a little louder, please? Yep. Thank you. Thank you. And preemption. Before I begin, if there's any pressing questions your Honors have yearning to get out, I'm happy to answer those questions. Otherwise, I intend to begin. Thank you. I think Churchill said something like it's a mystery wrapped in an enigma inside or outside of a conundrum. And what is bothering me is the fact that, from what I can tell, the pink pills were never tested. Well, correct, your Honor. But for a manufacturing defect, all you need is one pill to be defective. You don't need a batch. You don't need an assembly line to be spewing out. Usually the way you determine whether or not an egg is rotten is you open it. And so I don't know how you can tell that a pill is defective if you don't test it. Well, I think that's an evidentiary issue, your Honor, that doesn't really apply for a pleading stage. I don't believe the law requires you to obviously take all your evidence and then plead it. Whether that can be done at the next stage before summary judgment, I think that's more. I understand what you're saying, at least in my own mind, is that you don't have to prove the cause if you exclude all other possibilities, which sounds somewhat like Sherlock Holmes. But the point is that there are other things that would appear to be possible, such that if you are going to use this approach, you're going to fail because you also have to therefore exclude all other possibilities. How are you going to do that? With the strict product claim, your Honor, I don't believe we have to exclude all possibilities. I think this is under the Tweedy case. You can infer that there is a defect, right? And you can infer, and that goes on, that there's no other reasonable misuse. There's no other claim. And the complaint, again, that's after a jury trial. You probably can infer anything, but whether or not you ever get past the promulgation case is debatable. And what I've been talking about is burden of proof. And what you're talking about is attempting to distinguish and claim that there is a lesser burden of proof or at least a different burden of proof because of what it is that the cause of action relates to, which is supposedly a defective pill or a defective product. Am I correct in my understanding of what your argument appears to me to be, or am I misconceiving in some way? I don't. I guess what I'm struggling with is I understand you struggle with the evidence of the case once we get to that point. But before we can even get to that point, I don't think we should be foreclosed from attempting to prove our case. And that's why we're here on a pleading stage. And the elements for strict product liability are an injury, which we have, caused by a product, which we know, because of the L levels, were 1.9. We know that the other seizure medication levels were within the therapeutic range she needed. We know there's no change to her diet. There's no change to her daily activities. The only thing that's changed is this yellow-to-pink pill. And I think at a pleading standpoint, that is. Back up a second. You said that the L levels have changed? The L levels when she was admitted to the hospital were 1.9. The therapeutic range was between, I believe it was 10. And we then assume that your client had been absolutely compliant with her medication. That's an assumption that we have to make, right? Correct. And that's a legend from a pleading standpoint. I mean, that's taken as true. And I think the court can consider this is a lady who hasn't just started taking this medication. She's been compliant for, we know, at least seven years. And given her age, given obviously people's self-preservation, to assume she somehow messed up the medication when she just so happens to switch to the pink pill is a coincidence. Are you allowed to consider the earlier versions of the complaint where she indicated that seven years prior to taking the yellow pill, if you will, she nevertheless had seizures? Are you allowed to consider that in terms of whether there's another reasonable explanation rather than some defect in the pink pill? So I don't think the original complaint alleged that she had suffered seizures from the yellow pill. I think the complaint alleged she had been seizure-free for seven years since taking the yellow pill, which I think is a big distinction that obviously the court can consider. And I think when you consider that, again... So you're saying she wasn't taking the yellow pill prior to seven years? That's not what the complaint alleges, Your Honor. It just says she had a seizure seven years ago since being on the yellow medication. She's been seizure-free. You have an expert who's going to be willing to testify with a reasonable degree of pharmacological or medical certainty that to the exclusion of all other possible causes, that the pill, because of the scenario that you've just related, is the basis for the causation and it is a breach insofar as an adulterated or a defective pill. So as the complaint alleges, the treating doctor will link the pill to the causation. The treating doctor who's been treating her for seven years will be able to tie those issues together. And this isn't really discussed about, but to your point, in the original complaint we had an affidavit from a pharmacologist attached. Defense counsel moved to strike. Rather than fight over whether or not the affidavit is sufficient at this stage, we withdrew it. So there's at least two experts that the record can support that will help prove the plaintiff's case if we're allowed to, obviously, prove our case. Why doesn't the learned intermediary doctrine shield the pharmacist? So the problem with the learned intermediary doctrine, that issue becomes which pill to give, right, what prescription. And, again, this is an evidentiary issue when it comes to seizure medications. But the pharmacist isn't prescribing, right? Correct, but they are able to substitute switched medications. Because the doctor said that the prescription from the doctor said DAW colon slash zero, no product selection indicated. So that tells the pharmacist that substitutions are permissible, correct? That's what they allege, obviously. I don't disagree with that. Again, because we were foreclosed from discovery, I don't think we can know what their systems mean and what did the doctor prescribe, what did the doctor write down, versus what did the pharmacist do. I think the issue is deeper than whether or not there was a change from one prescription to another. I think the issue is, you know, they're going to raise that issue, but the issue is was the pill that was prescribed, was it in the same form it was supposed to be, or was there something that made it so that the L levels were going to be less because it was adulterated? Well, we're focusing on the pharmacist. So the pharmacist has a prescription, and the pharmacist is filling the prescription, and the pharmacist is filling it with another generic that is FDA approved. So how does the pharmacist not protect it by learning the intermediary doctrine? Because that deals with the decision on what to give, not whether or not the pill that was given was adulterated, met the formula, met the compound. How would the pharmacist ever be liable for that? Be liable? Let's assume the pill was adulterated. How would the pharmacist, who has no knowledge of that, be liable for that? Strict product liability, and then they can file the affidavit to blame it on SoCo, which they've kind of done, but we didn't get to that point. And that's the retailer statute that Illinois has, but that's a separate issue that we're not here for tonight. Did your treating doctor make a statement that had she known, she would not have allowed the substitution? I can't recall, Your Honor, if that was in the record or not. Well, if it were, would it not indicate by a negative pregnancy, so to speak, that what Justice Brennan was suggesting, which is the learned intermediary, would have indicated that she would have changed her mind, and since she's changing her mind to a point where there is not supposed to be a substitution, that the converse or the antithesis would have been that there was the opportunity, the right, the privilege to make a change. I guess I would argue that's an inference that at this stage should not be taken against the complaint. That's an inference that perhaps they can make in summary judgment, but that's not an inference that you can make today. So you're disavowing the statement that you earlier stated was the basis upon which you were going to establish that the pill was defective? No, respectfully, I'm not disavowing. I think that's the statement. How do you infer the statement is what I'm trying to argue. You can't take a negative inference. You need to take inferences in favor of the complaint. The other thing, too, about the learned intermediary doctrine is, you know, this is where we get to the voluntary undertaking. So once you have a patient who notices that the pill is now purple, makes a comment to their pharmacist and says, is this safe to take, the pharmacist doesn't say, ask your doctor, doesn't say, this is what was prescribed, doesn't say, I don't know, this is between your doctors, it's okay to take. So now we're getting into the voluntary undertaking case law, and that's the Wacolich case where even if the learned intermediary doctrine could apply, which, again, in strict products, I don't think it does. How is the pharmacist supposed to know that the question relates to the metaphysical aspects of whether or not this woman is going to have a problem with taking it for any reason in existence as opposed to whether or not it's okay to substitute this for that because that's what the directions to him were, and according to the labels, the two were equivalencies. Well, I think when claiming the word is it safe to take, it's literally the medication that she was taking is the name of the level that was low on her body. There's no other side effect or health concern that I think, again, going to inference, is one should take at this stage to say that he was referring to the P levels because the P levels subject to a separate medication. This only deals with the L levels, which we know were 1.9, well below the therapeutic level. Did the doctor, the treating doctor, indicate that the causation was due to the fact that the pills were supposedly either underdosed or they were adulterated in some way, shape, or form through either an enzyme or other compound or chemical that altered the efficacy of the pill? I think at this stage for the plea, all she has done is connect the pill to the causation. Let me just clarify one thing. In your brief, you alleged that the pink pills were adulterated, but is that allegation contained anywhere in the Fifth Amendment complaint? Well, it's in the Second Amendment complaint. Well, but is that the operative complaint? Well, I believe the Fifth Amendment complaint incorporates, by reference, the prior allegations and counts that were dismissed rather than superseded them. So, you know, backing into it, yes. And then lastly, because I'm sure I'm running out of time, the preemption issue. Again, this is a product that did not operate as intended and cause harm. This is well outside any case law cited where we're talking about off-label use, unintended use, random side effects that appear, bad side effects that appear. This is product liability. The pill was taken, the pill caused harm, and it caused harm in a manner that it's absolutely designed not to do, and that's to keep the L levels at a therapeutic level. So the case law is clear that there is no preemption on such a situation because that constitutes misbranding. There's federal statutes that talk about what happened can't happen, and so there's nothing about this case or state law that conflicts with federal law or requires a defendant to do something for state law that they can't meet for federal law or vice versa. It's basically a parallel of any potential claims that could be under federal law for the branding of this drug. The other thing, too, and this goes back to your point, Justice McLaren, is res ipsa. Res ipsa comes into play when you can't necessarily prove or do you necessarily know what went wrong, but something categorically went wrong that caused this woman, obviously, severe harm because her L levels were so low. What's the source of the duty in your res ipsa claim? I mean, the source of the duty would be that the pill that's prescribed can't be misbranded, can't be mis- or undulterated. The strict product claim in that the pills that are given need to be the same formula, the same compound, the same makeup as a pill that is designed, obviously, to keep the L levels up. So that would be the source of the duty. And, again, Justice McLaren, to your point, I mean, under res ipsa, you don't have to plead and prove the absence of comparative fault, the absence of negligence by the plaintiff. It's there for situations, tough situations, where, again, this pill's been consumed, this pill's been digested, and, you know, can it be tested? But that's an evidentiary issue. Mr. Cronin, you'll have an opportunity for rebuttal. Thank you. Oh, I apologize. Oh, I forgot. I had to interrupt my time. I'm going to take responsibility for that. I do apologize. I'll ask it when you come up on rebuttal. Justice, do you already have any additional questions? I have no additional questions. Thank you. Thank you. Mr. Trickleman. I'm going to ask you the question I was going to ask Kim, so he gets to hear the question and he can be ready to answer it when he gets back up here. And that is, is that normally I believe res ipsa requires control. It means that you are the one who has the best access to the evidence and that the other party who's requesting res ipsa is incapable because of custody, possession, control, whatever, unable to establish the elements of whatever cause of action they're presenting. Where in this scenario does your client have control such that you're able to establish whether or not you are not negligent? Thank you, Judge. Chris Drinkwine on behalf of Hy-Vee Incorporated. And with respect to your question, Judge McLaren, the control element is lacking in the case for a number of reasons. But most foremost is that the pills were in the hands of the plaintiff, and she was in control about whether she was going to take them as directed or not. She had them then, but she hasn't now, doesn't she? She does, Judge. She has them now. And before I forget, your other question at the outset of Appellant's argument was about testing. And for purposes of clarity, appellees are keenly aware that this court is limited to the record before them. However, so I can't cite plaintiff's discovery answers to our discovery request. Those materials aren't filed in the circuit court file. They're not part of the record before you. But I would direct your honors to page R-106 of the record on appeal, where defense counsel states on the record, arguing before Judge Waller, that the plaintiff has disclosed to the defense that they have had the pills tested. And plaintiff's counsel had an opportunity to speak after that, and he didn't refute it. So even after having the pills tested, we don't have a specific allegation of a particular defect in this case. There's no allegation that the pills were less than the 500 milligrams of levitercitam that they were supposed to have. We don't have any other form of defect alleged, having had it tested. Now, I'm not sure the pertinence of that, other than perhaps the decision not to allow further amendment, because, of course, futility is grounds to disallow further amendment. And they had five chances to state a claim for strict product liability. The allegation that plaintiff asked the pharmacist if it was safe to take the pills and that the pharmacist said that they would be okay to take is insufficient to state a negligent voluntary undertaking for two reasons. First, because the pharmacist has no duty under HAPL v. Walmart, which is the learned intermediary case, to warn plaintiff about the medication that the doctor prescribed, he was not undertaking a duty by responding affirmatively to her question. The pharmacist was merely saying that these are the pills that your doctor prescribed. This is the medication that your doctor prescribed, because that's the ---- In HAPL, just so I'm clear, in that case, the exception to the doctrine arose from the pharmacist's knowledge of a particular allergy or whatnot as it related to the patient. That's exactly right, Justice Hudson. The court in HAPL ---- Brennan, pardon me. I wasn't sure whether that was a cop or a ---- It's right in front of you. Patient-specific information of a contraindicated drug is the exception in HAPL, Justice Brennan. And that's not something that's alleged here. So the duty is limited to the HAPL v. Walmart duty, and he didn't go beyond that, the pharmacist. And even if you look at Section 323 of the restatement, that requires an allegation that the pharmacist voluntarily rendered services, which he should recognize as necessary for the protection of the plaintiff. In order to recognize a need to protect the plaintiff, the pharmacist would have ---- he would have had to know or had reason to know at the time he told her the pills were okay to take that they did not contain the 500 milligrams of levotriacetam or were adulterated or had some other defect. There's no allegation in the amended complaint that meets that requirement. The voluntary undertaking complaint went out in the amended complaint, the second complaint filed. So it's not stated a claim for negligent voluntary undertaking. Plaintiff has not stated a claim for a failure to warn strict liability theory either. In order to do so, plaintiff would have to allege that defendants knew or should have known that the pink pills were in an unreasonably dangerous condition and that that condition caused or, I'm sorry, because they had less than the intended amount of the drug in them or some other form of defect. The only allegation we have in this regard is that defendants knew the contents of the bottles due to their role in the manufacturing and packaging process. But plaintiff doesn't plead facts explaining why their role in manufacturing and packaging gave them knowledge or reason to know that the pills were unreasonably dangerous because they contained less than the intended amount of the drug or were in some other way defective. So the allegations in support of the failure to warn strict liability claim are wholly conclusory and insufficient. To state a cause of action for the strict liability based on a manufacturing defect, plaintiff must plead facts indicating that the pink pills were in an unreasonably dangerous condition  The Fourth Amendment complaint alleged that the pills had materially less than 500 milligrams of levotiracetam. In addition to being conclusory, that allegation is not in the Fifth Amendment complaint. So plaintiff is asking the court to infer that the pink pills caused her seizures because they didn't have the intended amount of the drug in them or were otherwise defective. Based on her allegation that her levotiracetam level on April 30th, 2019 was below the therapeutic level. But this allegation together with all the allegations in the Fifth Amendment complaint do not satisfy the criteria set forth in Treaty v. Wright-Ford sales where our Supreme Court held that where no specific defect is alleged, the plaintiff may resort to circumstantial evidence that supports an inference of defect but only where there is an absence of abnormal use and there are no reasonable secondary causes of the injury. Now it's true that Tweedy followed a trial and wasn't at the motion to dismiss stage but the appellate court in the Stoltman v. Casey-Buick case specifically held that Tweedy does not suggest that a plaintiff need not plead facts supporting the inference of defect. And more recently, the Northern District of Illinois in the Louisville Ladders case dismissed a strict liability claim where plaintiff failed to allege facts excluding other reasonable causes. And the court explained that the Illinois cases require plaintiff to rule out other reasonable causes. So we're clear. And what are the other reasonable causes that you argue failed to be excluded? Well, Judge, there's two of them. The first is the allegations that there was abnormal use in the case. And the second one was the breakthrough seizures, meaning that she... The abnormal use, doesn't that require us to draw an inference, an adverse inference against the plaintiff here? No, because in a case where you're pleading strict liability and you're required to plead the Tweedy elements, you have an affirmative duty to plead facts that negate other reasonable causes. And, you know, the absence of abnormal use is just another reasonable cause, right? The plaintiff is required to plead facts when you read Tweedy together with Stoltman and the cases cited therein that negate these other causes. And in our case, she's done exactly the opposite. She's affirmatively pled abnormal use when she pled that she had 48 days' worth of the yellow levotracetin pills left, which is 144 pills, that's three pills a day, when she picked up her 90-day prescription at Hy-Vee on March 6, 2019. So because one reasonable inference that you can draw from that allegation is that she wasn't taking three pills a day as directed, she's failed to plead facts ruling out abnormal use. Instead, she's pled facts indicating that abnormal use is a possible cause and that defective pills are therefore not the only probable cause of her seizure. So you're suggesting if we do the math and count the days at three pills a day and the number of pills she had left, she wasn't taking three a day. Is that your position? Judge, she had more than half of the 90-day prescription left when she picked up her new one. Now, we all understand there's got to be some overlap, so you don't run out of pills when you pick up your prescriptions. But this was 48 pills of the 90 pills were left in her former prescription of the yellow pills when she picked up the pink pills at Hy-Vee. So a reasonable inference that you can draw from that is she's not taking them as directed. She's not taking three a day. Maybe she's forgetting the two in the morning. Who knows? Maybe she's forgetting the one she's supposed to take at night. But you have affirmative facts pledged showing abnormal use was exactly the opposite of what she needs to plead in order to comply with the Tweedy requirements. Isn't it equally reasonable, for instance, that she just filled her prescription early? That's also a reasonable inference, absolutely. But remember, she has an affirmative duty to plead out the other reasonable cause, an affirmative duty to state facts that rule out abnormal use and any of these other secondary uses. It sounds like you're arguing something similar to what I said, which is you have to prove, not just allege. Ultimately, you'll have to prove. That all other possible or reasonable causes are excluded. And that's exactly right. It's because it's an extraordinary thing for the law to allow an inference of defectiveness arise from nothing. You have no evidence. You can't even plead why it's defective. But we're going to let you have a prima facie case based on an inference, but only when you can plead and prove that there's no other secondary reasonable cause, where there's no abnormal use of the product. And that's why it's important to state a claim that you have to plead those facts. Any other questions? No. And am I correct that we're now going to go to Ms. Jansen? Ms. Jansen. Good afternoon, Your Honors. Ms. Jansen, can I just ask a question right at the beginning? Why, given the fact that federal preemption might be completely dispositive of the entire case, why is it? Why are you only spending two pages on that? Because it's so clear and straightforward, which is also why we're only spending four minutes of the oral argument on it, Your Honor. So for the strict liability claim, they have to show an unreasonably dangerous product. To do that, you can show it's unreasonably dangerous because of how it's composed, how it's made, or because you haven't provided adequate warnings. PLEFA and Bartlett are abundantly clear that the content, the chemical composition of the drug is governed by the FDA. They can't change the composition of the drug. The labeling, the warnings provided, are governed by the FDA. They cannot be changed. And because this is a generic, the composition and the labeling need to match the branded drug that the FDA has approved. If they can't change either the composition or the labeling, then both the strict liability claim based on unsafe product or inadequate warnings are preempted. And honestly, that's about as straightforward, I think, as you can get. And if you don't have any questions, I don't. Well, what if the plaintiff shows that the label is in error because the pills aren't the strength they say they are? He would have had to have pled that for that to state a claim. So you're saying that under the facts pled, there's preemption? Absolutely. But there may be other facts that, had they been pledged, preemption might not have applied? If he pled that the composition, so they're required to maintain the same composition as the branded drug and the same labeling, if he had pled something like, oh, the label didn't provide the warnings that are included on the brand name drug, yeah, then that would not be preempted because that's not conflicting with the federal requirement. The label said 500 milligrams and there was only 400 milligrams in each pill? Then that would also be a deviation from the composition of the drug. Then you wouldn't have the federal preemption because the federal preemption requires you to keep it the same. If the claim is based on the fact that it's not been kept the same, then it wouldn't be preempted. But he hasn't alleged that. The only thing he has alleged is that the pill is pink and previous versions of the drug that the plaintiff took were yellow or off-white. That doesn't say anything about the composition of the drug. Is there a contest as to what the color of the original pill was? I don't believe so. So what is it, yellowish or beige? I should say it's not uncontested. It's immaterial. So I don't know for sure what the exact color of the original, but it wasn't pink. It wasn't pink, exactly. That's kind of the nature of generic versus branded drugs. Anyone who's taken a prescription medication, they all have their different shape, different color, different markings. Were the pills different shaped or marked in a different way other than color? I'm not sure I know the answer to that, Your Honor. I would assume so because each manufacturer has its own unique markings, but I can't say I know that for certain. Well, I would assume that she's not colorblind because she can tell the difference between pink and yellow. Correct. So although those are distinguishing marks, I was wondering if there were any other distinguishing marks that would have put her on notice that the pill was different than what she was originally taking. None that I'm aware of, no. So this, the pink pills versus the yellow pills. Let me back up. The yellow pills have no distinguishing marks that you're aware of. Not that I'm aware of. The pink pills, do they have any marking on them at all? And I don't know that this is in the record. I know from having looked at the FDA labeling, it's like pink. It's kind of oval shaped. I think there's like SLC. There's some letters and numbers on it. All right. Here's really the gist of my question. Is there anything about those markings that would indicate what the dose of that pill is, the operative therapeutic? No. But I do believe, and I'm not positive, but I believe that the different color and shape, if you go back to the FDA. That correlates to a specific dose. Yes, exactly. That you would be able to tell, but not necessarily the ordinary consumer. Okay. Thank you. Thank you. Mr. Program. Just to start to answer Justice McClaren's question as it relates to control. The case law is clear. Control is supposed to be flexible. It's supposed to be liberal. It's not supposed to be rigid. And when you look at control, you don't look at control at the time of injury per se. You look at control at the time of the act that eventually causes the harm. So in this case, that would have been either when it was produced by Sulco or when it was filled by Hy-Vee. You can have joint control. You can have consecutive control. The case law is clear on that. So I hope I answered your question, but control is not at the time of injury. It's the act of the drug. You answered my question, but I'm not sure I understand it. I'd be happy to try to clarify. I'm not quite sure I understand it because I'm not sure how the possession that the defendant or defendants had prior to the transfer to your client would put them in a better position to establish the facts that are necessary to sustain your cause of action. And I'm going to have to think very deeply about that. Okay. And, again, I would just allege that goes to whether this is some type of compound error versus just a substitution error. But, again, without discovery, we're not sure. As it relates to reasonable cause, Justice Brennan, this, I think, dovetails on the Tweed case. And the Tweed case is similar to this case in that you have a vehicle that was alleged to be defective. Brakes went out. Car was mangled. You couldn't test the car. You couldn't necessarily inspect the car because the brakes mangled from the crash. Or were the brakes defective and caused the crash? Plaintiff put on no expert at all to link the two together. And Tweed says, even though there's no expert, even though we can't necessarily prove conclusively, beyond a reasonable doubt, which isn't the standard, I get that, but go with me on this, you can still prove your case by proving that there is no abnormal use. There is no unreasonable reason for the crash. That is the abnormal, unreasonable use. And that, again, becomes an evidentiary standard down the line, depending on what the facts and evidence are, assuming we can get discovery. Justice Jorgensen, to answer your question, as much as math helps us try to figure out and back into things, the problem is, as Justice Brennan pointed out, how many pills did she have to start? How many pills did she use? And without that starting point, you can't back into a number and say, oh, she had this many pills, she took this many, therefore we can presume or infer that she took her medicine improperly. Again, this is a very important medication to an individual. The complaint sets forth that. If that medication is not taken properly, which we know it has been and it's alleged that she did, bad things happen. I think the court can consider that. This isn't Tylenol, this isn't aspirin. If the L levels drop, bad things are going to happen. Anyone's self-preservation is going to make sure that medication is going in like clockwork. Counsel, Mr. Brinklein mentioned that you didn't include in the fifth complaint what you had in the fourth complaint. Do you remember what he was talking about? To be honest, Justice, I do not. I think it had to do with the idea that there was some indication of the property or that the pill had been tested. So I can clarify that. So were the pills that were consumed digested or those tested? No, they can't be. They've been used. And the case law is that just because do we have pills? Yes, there's three bottles. Because say we test all three of those bottles, every pill comes back normal. Does that mean that the one pill that was digested was normal? No, because the analogy I would give is think of a meat processing plant, a chicken processing plant. If a mouse gets in that tank and that mouse makes it through to the store and that store sells the adulterated meat, does that mean all the other meat's bad? No. But, you know, again, with these pills in time, can we test all the pills? Yes, but the pills at issue that were consumed, they were digested, they weren't tested. They can't be tested. And just because they can't be tested doesn't mean that even if we do test every pill that we have necessarily disproves causation. How many pink pills did your client take? I apologize, Justice, but I believe it was approximately three to four days before she went to the hospital. I believe. That would be 12 pills out of 90. Would the inference be if all the rest were within normal ranges, that the first 12 were within normal ranges? I mean, I don't think that's a leap that can't necessarily be taken because there's so many variables in which 12 pills, where are they at? You know, shipping pills get circled around, shaken around. I mean, I think that would be a big leap. What's your response to the 48 pills and having to exclude other alternative causes? I think the complaint at this stage does that. I think going to Tweed, you know, if we go to get past summary judgment, go to trial, and we don't put an expert, then I think Tweed states you can prove your case in a strict product situation by creating inferences, and here's how you create the inferences. But if we can have an expert or if we have the direct evidence, I don't think that applies. Any additional questions? I have no further questions. No. All right. Thank you to both parties. The matter will be taken under advisement, and an opinion will be issued in due course. Thank you.